UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLAND DIVISION

RAVEN SUN CREATIVE, INC.,

     Plaintiff,

v.                                                                  CASE NO: 6:21-cv-1864-ACC-EJK

WALT DISNEY PARKS AND
RESORTS U.S., INC.,

     Defendant.

## WALT DISNEY PARKS AND RESORTS U.S., INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................1

II.   LEGAL STANDARDS .........................................................................1

III.  CONSTRUCTION OF THE DISPUTED CLAIM TERMS......................2

  A.    "Amusement Ride Apparatus" .......................................................2
  B.    "Rider Station Trolley" ..................................................................5
  C.    "Rider Station Tower"....................................................................7
  D.    "Motor System" .............................................................................8
  E.    "Controller".................................................................................. 14
      1.    Section 112(f) Applies to the Claimed "Controller"............ 16
      2.    The Recited Functions of the "Controller"........................ 21
      3.    The Corresponding Structure for the "Controller" ........... 22
      4.    The "Controller" Terms Are Indefinite ............................. 25
  F.    "Coordinate" and "Coordinating" ............................................. 28

IV.   CONCLUSION ................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
 312 Fed. Appx. 326 (Fed. Cir. 2009) ...........................................................22

*Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*,
 521 F.3d 1328 (Fed. Cir. 2008) ...................................................... 18, 25, 26

*Astrazeneca AB, Aktibolaget Hassle, KBI-E, Inc. v. Mutual Pharm. Co.*,
 384 F.3d 1333 (Fed. Cir. 2004) ................................................................. 10

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
 289 F.3d 801 (Fed. Cir. 2002) ......................................................................2

*Creo Prod., Inc. v. Presstek, Inc.*,
 305 F.3d 1337 (Fed. Cir. 2002) ................................................................. 21

*Datamize, LLC. v. Plumtree Software Inc.*,
 417 F.3d 1342 (Fed. Cir. 2005) ................................................................. 30

*Deere & Co. v. Bush Hog, LLC*,
 703 F.3d 1349 (Fed. Cir. 2012) ....................................................................2

*Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*,
 899 F.3d 1291 (Fed. Cir. 2018) ................................................................. 16

*Egenera, Inc. v. Cisco Sys.*,
 972 F.3d 1367 (Fed. Cir. 2020) ................................................................. 20

*Eli Lilly & Co. v. Teva Pharm. Int'l GmbH*,
 8 F.4th 1331 (Fed. Cir. 2021) ................................................................. 4, 5

*Fiber, LLC v. Ciena Corp.*,
 792 Fed. App'x 789 (Fed. Cir. 2019).......................................................... 20

*Grecia v. Samsung Elecs. Am. Inc.*,
 780 Fed. App'x 912 (Fed. Cir. 2019).......................................................... 16

*Intelligent Automation Design, LLC v. Zimmer Biomet CMF & Thoracic, LLC*,
 799 Fed. App'x 847 (Fed. Cir. 2020).......................................................... 20

iii

*Interval Licensing LLC. V. AOL, Inc.*,
    766 F.3d. 1364 (Fed. Cir. 2014) ..................................................... 30

*JVW Enters., Inc. v. Interact Accessories, Inc.*,
    424 F.3d 1324 (Fed. Cir. 2005) ..................................................... 21

*In re Katz Interactive Call Processing Pat. Litig.*,
    639 F.3d 1303 (Fed. Cir. 2011) ................................................17, 18

*MEMS Tech. Berhad v. Int'l Trade Comm'n*,
    447 Fed. Appx. 142 (Fed. Cir. 2011) ..............................................2

*MIT v. Abacus Software*,
    462 F.3d 1344 (Fed. Cir. 2006) ..................................................... 16

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014) ................................................................... 25

*Novatek, Inc. v. Sollami Co.*,
    559 Fed. Appx. 1011 (Fed. Cir. 2014) ...........................................2

*Oatey Co. v. IPS Corp.*,
    514 F.3d 1271 (Fed. Cir. 2008) ......................................................8

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ....................................1

*Pitney Bowes v. Hewlett-Packard Company*,
    182 F.3d 1298 (Fed. Cir. 1999) ......................................................3

*SIPCO, LLC v. Emerson Elec. Co.*,
    980 F.3d 865 (Fed. Cir. 2020) ...................................................... 19

*Soque Holdings (Bermuda) Ltd. v. Keycsan, Inc.*,
    No. C-09-2651, 2010 WL 2292316 (N.D. Cal. June 7, 2010) ...................... 18

*Sysmex Corp. v. Beckman Coulter, Inc.*,
    No. CV 19-1642-RGA-CJB, 2021 WL 1259710 (D. Del. Apr. 6, 2021) . 19, 23

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015) (*en banc*) ...........................*passim*

*Wis. Alumni Research Found. v. Apple Inc.*,
    905 F.3d 1341 (Fed. Cir. 2018) ..................................................... 11

# STATUTES

35 U.S.C.
    § 112(f) .................................................................................*passim*
    § 112 ¶ 2 ................................................................... 25, 26
    § 112 ¶ 6 ............................................................ 15, 16, 25, 26

## I.    INTRODUCTION

Plaintiff Raven Sun's opening claim construction brief refuses to engage with inconvenient facts and law.  On the facts, Raven Sun ignores the words it chose for its patent claims and tries to import numerous concepts into claims that say nothing of the sort.  And on the law, Raven Sun's analyses rest on fundamental errors, notably disregarding or failing to correctly apply the settled precedent of Federal Circuit cases.  Only WDPR's proposed constructions stay true to the claim language and specification as *Phillips* mandates, and reflect what the inventor actually told the Patent Office he invented in 2014—not what Raven Sun takes false credit for years later.  Respectfully, the Court should reject Raven Sun's claim constructions and adopt WDPR's.

## II.    LEGAL STANDARDS

Claim construction begins with the claim language because the claims "define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*).  The specification, though, "'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Phillips*, 415 F.3d at 1315 (citation omitted).  Courts may also consider "extrinsic evidence," which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."  *Phillips*, 415 F.3d at 1317.

## III.    CONSTRUCTION OF THE DISPUTED CLAIM TERMS

### A.    "Amusement Ride Apparatus"

| Raven Sun's Construction | WDPR's Construction |
|---|---|
| "A ride for use in a public amusement park." | The preamble is not limiting; no construction necessary. |

Raven Sun proposes a construction that seeks to diminish the substantial body of prior art related to flight simulators and other like applications that invalidate the claimed invention of the '028 patent.  That construction should be rejected, the preamble held to be non-limiting on the claimed structure, and no interpretation imposed on the simple words of the preamble itself.

A preamble is limiting if it is "necessary to give life, meaning, and vitality to the claim." *MEMS Tech. Berhad v. Int'l Trade Comm'n*, 447 Fed. Appx. 142, 149 (Fed. Cir. 2011).  More specifically, a preamble may limit a claim if it recites "a fundamental characteristic of the invention."  *See, e.g.*, *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1358 (Fed. Cir. 2012).  Further, "clear reliance on the preamble during prosecution to distinguish the claimed invention from prior art transforms the preamble into a claim limitation," *Novatek, Inc. v. Sollami Co.*, 559 Fed. Appx. 1011, 1015 (Fed. Cir. 2014) (citation omitted), and "dependence on a particular disputed preamble phrase for antecedent basis may limit claim scope…."  *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002).

Conversely, if "the body of the claim fully and intrinsically sets forth the complete invention, including all of its limitations, and the preamble offers no distinct definition of any of the claimed invention's limitations, but rather merely states, for example, the purpose or intended use of the invention, then the preamble is of no significance to claim construction because it cannot be said to constitute or explain a claim limitation." *Pitney Bowes v. Hewlett-Packard Company*, 182 F.3d 1298, 1305 (Fed. Cir. 1999).

Here, the preamble of claim 1 states an intended purpose, and nothing more. The intrinsic record demonstrates the absence of any hallmarks that show this preamble is "necessary to give life, meaning, and vitality to the claim," and there is no reason the structure recited in the body of the claims would not have utility in flight simulators, coal mine people movers, or myriad other applications that transport people vertically along a tower structure.

The language of the preamble itself is telling; it contains just four words: "[a]n amusement ride apparatus." '028 patent cl. 1. On its face this merely provides an intended use for the invention, *i.e.* as an amusement ride. The preamble does not include any structural features at all, let alone a description of "a fundamental characteristic of the invention." Nor does the preamble provide antecedent basis for any other claim limitations.

Moreover, the limitations in the body of the claim—without aid of the preamble—describe a structurally complete invention. One of ordinary skill

3

would understand that the other elements would function the same whether used for an amusement ride or otherwise.  This was confirmed by Raven Sun's expert, Ken Kutchek.  Ex. E, Kutchek Dep. 16:3-17:16 (admitting none of the body limitations are specific or unique to amusement park rides); *see also id.* 12:11-13:10; Messner Decl. ¶¶ 57-64; *Eli Lilly & Co. v. Teva Pharm. Int'l GmbH*, 8 F.4th 1331, 1341 (Fed. Cir. 2021) ("[A] statement of intended purpose in the preamble . . . was not limiting because the claimed apparatus was fully structurally claimed in the body of the claim, and its structure would allow it to function identically whether or not used for its stated intended purpose.")

The specification also never suggests the body elements of the claimed invention are unique to an amusement ride or that using the claimed structure in an amusement ride is somehow importantly different from using it in any other application.  To the extent the specification describes an amusement ride, these descriptions are, as in the preamble, just statements of intended purpose. '028 patent Abstract, 1:5-3:36, 5:26-61, 8:49-9:7, 14:32-37.

Further, the preamble was never invoked during prosecution to distinguish the prior art.  And for good reason: even Raven Sun considered flight simulator art to be relevant during prosecution and disclosed such art to the Patent Office.  *See* Exs. A-D, '028 FH (disclosing U.S. Patent 5,453,011 ("Flight Simulator"), U.S. Patent 5,791,903 ("Flight simulator with full roll rotation capability"), and U.S. Patent Pub. 2002/0068641 ("Roller coaster based simulator

4

for amusement and flight training"); *see also* Messner Decl. ¶¶ 66-67.

*Eli Lilly*, relied upon by Raven Sun, is inapposite because that case addressed method claims with preambles that provided antecedent basis for other limitations. As the Federal Circuit noted,

> ***In contrast to apparatus and composition claims***, claims to methods of using such apparatuses or compositions are not directed to what the method 'is,' but rather they typically rely entirely on what the method 'does.' ***And what a method does is usually recited in its preamble***."

*Eli Lilly*, 8 F.4th at 1341.[1]

Finally, even if the Court were to hold that the preamble is limiting, it should reject Raven Sun's adornments to the claim language. Specifically, while the preamble is open to ***any*** "amusement park ride," Raven Sun rewrites that simple phrase to permit only a "***public*** amusement park." "Public" is found nowhere in the patent, and should not be injected now.

## B.    "Rider Station Trolley"

| Raven Sun's Construction | WDPR's Construction |
|---|---|
| "A structure for supporting the rider station and engaging the rider station tower for vertical movement." | Plain and ordinary meaning. |

The plain language of "rider station trolley" would have been easily understood by a person of ordinary skill based on the claim language alone. Messner Decl. ¶¶ 68-73.

---

[1] Emphases supplied and internal citations omitted unless otherwise noted.

To begin with, the claim already makes clear that the apparatus includes "a rider station trolley for supporting the rider station" and "a rider station tower operatively engaged with the rider station trolley such that the rider station trolley can move vertically along the rider station tower." '028 patent cl. 1. Raven Sun's construction largely (and unnecessarily) duplicates this language (though deleting "operatively"):

| Raven Sun's Construction | Claim Language |
|---|---|
| "a structure for supporting the rider station and engaging the rider station tower for vertical movement" | a rider station trolley for supporting the rider station; <br><br> a rider station tower operatively engaged with the rider station trolley such that the rider station trolley can move vertically along the rider station tower |

Repeating some, but not all, of the claim language as Raven Sun does here invites confusion and, if one superimposes Raven Sun's proposed construction over the term "rider station trolley," things only get more confusing with large chunks of text repeating themselves, and other text dropping out altogether.

The specification also fails to support Raven Sun's construction. The passages cited by Raven Sun do nothing more than recite the same elements already found in the claim language. *See* '028 patent 1:59-65, 5:24-43. Indeed the specification as a whole consistently just uses the plain meaning of "rider station trolley" in ways nearly identical to the claim. *Id.* Abstract, 1:53-4:16, 4:50-7:23, 8:49-9:50, 10:52-13:56, 14:9-31, Figs. 1-17.

6

Accordingly, Raven Sun's proposed construction should be rejected.

### C. "Rider Station Tower"

| Raven Sun's Construction | WDPR's Construction |
|---|---|
| "A vertical tower structure that vertically guides a rider station trolley." | Plain and ordinary meaning. |

"Rider station tower" would also have been easily understood by anyone reading the claim, and so should be given its plain and ordinary meaning. Messner Decl. ¶ 76. Raven Sun's proposed construction is inconsistent with the claim language and the specification and so should be rejected.

A person of ordinary skill would immediately understand what a "tower" is, and there is no special meaning given to "tower" in the '028 patent. Messner Decl. ¶¶ 76-79. Notably, Raven Sun's proposed construction makes no attempt to define "tower" and instead just reuses the word, acknowledging its plain meaning. Taken as a whole the plain language of the claim merely requires a tower for the rider station, and nothing more.

Raven Sun also improperly imports an additional requirement that the rider station tower "vertically guide" the rider station trolley. But the express claim language only requires the tower to "operatively engage" with the trolley such that it can "move vertically along the rider station tower," not that it "guide" the trolley. While it is true that some embodiments in the specification describe "vertically guiding" the trolley (*see, e.g.*, '028 patent 3:37-51, 6:19-67,

7

8:32-34), others only state that the tower "constrains the trolley to being moved vertically up and down the tower" (*see, e.g.*, '028 patent 1:59-2-43, 2:44-3:11). Raven Sun's construction would improperly read the "vertically guiding" embodiments into Claim 1, and read the "constrain" embodiments out of the claim. *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1277 (Fed. Cir. 2008) (generally "incorrect" to construe claims to exclude an embodiment).

Further, here again none of the specification passages cited by Raven Sun define the rider station tower, and the specification consistently uses the plain and ordinary meaning of "tower." '028 patent Abstract, 1:12-4:16, 5:8-7:37, 8:11-9:50, 10:30-12:47, 13:26-56, Figs. 1-15.

### D.    "Motor System"

| Raven Sun's Construction | WDPR's Construction |
|---|---|
| "A system to vertically position the rider station trolley along the rider station tower." | "A system producing forces that it uses to drive a trolley vertically up and down." |

"Motor system" is consistently described in the claim language and the specification as a motor and a force transfer structure that produces the forces used to drive the trolley up and down. Ignoring all this, Raven Sun proposes a construction that reads the ***up and down*** vertical ***movement*** provided by the motor system out of the claims altogether and would cover any system that merely "***positions***" a trolley on the tower regardless of how. In this way, Raven Sun seeks to cover gravity, brakes, physical obstructions, or anything else that

8

"positions" a trolley on the tower, disregarding the language of the claims and the disclosure of the specification. This construction should be rejected.

The claim language is dispositive. First, it recites a "motor" specifically, as opposed to broadly covering any system that "positions" as Raven Sun would have it. Next, the motor not only "positions" the trolley; it "**moves**" the trolley and so must necessarily **apply forces** to drive the trolley. '028 patent cl. 1 (4th limitation: "a motor system … for vertically **moving** the rider station trolley"; 9th limitation: "the controller is capable of causing (a) the motor system to vertically **move** the rider station trolley"). And the claims broadly state that the motor system moves the trolley "vertically" making clear that it must be able to drive the trolley **both up and down**. WDPR's construction captures all of these express requirements of the motor system in the claims.

Raven Sun, on the other hand, asks the Court to read all of these limitations out of the claims. Instead of a motor moving the trolley, Raven Sun asserts that anything that "accomplishes the vertical positioning of the rider station trolley" would suffice. Pl.'s Br. 19. Not only does its construction contradict the requirement of the claim language that the motor system move the trolley, it is also far too broad—an upper floor in a tower building vertically "positions" whatever is on that floor by preventing it from falling to the ground below. Raven Sun's construction would ensnare such a "system" despite having no motor and moving nothing.

9

The specification is equally decisive.  The term "motor system" has a specific meaning in the context of the '028 patent, and includes not only the motor, but also a force transfer structure for taking the forces from the motor and applying them to move the trolley:  "The ***motor system*** 34 is comprised of a motor 54 for ***producing the necessary forces to move the rider and projector trolleys 24, 30 up and down*** along the tower 32 as desired and a force transfer structure 56 for applying the forces produced by the motor to the rider and projector trolleys 24, 30."  '028 patent 7:1-5; *see also Astrazeneca AB, Aktibolaget Hassle, KBI-E, Inc. v. Mutual Pharm. Co.*, 384 F.3d 1333, 1339 (Fed. Cir. 2004) ("rigid formalism is not required" for defining terms in a specification).  And this definitional language further establishes that the motor system "moves" the trolley "up and down along the tower."

Raven Sun's construction, on the other hand, errs because all the evidence in the specification—including the portions it relies on—expressly points to the motor system vertically ***moving*** the trolley along the tower, not just vertically ***positioning*** it.  *See, e.g.*, Pl.'s Br. 18-19 (citing '028 Patent 5:8-10 ("motor system used to ***vertically move*** the rider trolley along the tower"); 1:59-2:4 ("motor system . . . operates to ***vertically move*** the trolley along the tower"), 3:44-51 ("motor system for ***vertically moving*** the rider trolley up and down the tower"), 5:26-61 ("a motor system for ***vertically moving*** the rider trolley and rider station up and down the tower")); Messner Decl. ¶¶ 82-88.

10

Beyond this, the specification always describes the motor system as producing forces to drive the rider station trolley *up and down*. *See, e.g., Wis. Alumni Research Found. v. Apple Inc.*, 905 F.3d 1341, 1351 (Fed. Cir. 2018) ("Where, as here, a patent repeatedly and consistently characterizes a claim term in a particular way, it is proper to construe the claim term in accordance with that characterization.") (citations and quotations omitted).  Raven Sun's construction fails because it excludes the requisite upward movement.

Specifically, the Summary of the Invention describes the motor system as producing forces to move the trolley *up and down*, for every embodiment:

> In one embodiment, . . . [t]he ride further includes two systems for *imparting motion to the rider station*. The first system is a motor system that is operatively engaged to the trolley and operates *to vertically move the trolley* along the tower. . . . Such positioning may involve imparting *a high G ascent, a negative G descent*, and/or a substantially constant rate of *ascent or descent*.

'028 patent 1:59-2:43; *see also id.* 2:44-3:11 ("the tower constrains the trolley to being moved vertically *up and down*"); 3:12-36 (same); 3:37-60 ("motor system for vertically moving the rider trolley *up and down* the tower").

The reference in the passages above to the motor system causing a "high G ascent" and a "negative G descent" are also highly instructive.  '028 patent 1:59-2:43, 3:37-60.  Causing the rider station trolley to ascend at all, and achieving a "high G ascent" in particular, are movements which, obviously, cannot be produced by gravity (which is limited to downward movement).

Messner Decl. ¶ 89.  Rather, a motor must be used to drive the trolley upward.
*Id.*  And to achieve a "negative G descent" in which the rider station is acceler-
ated downward faster than gravity could achieve is also only possible with a
motor producing forces; a descent controlled only by gravity could never reach
"negative G."  *Id.*  Raven Sun's expert again confirmed WDPR's construction:

> Q.  And so we know that when they're imparting a high G ascent here
>     in the specification, ***that means you're using the motor to im-
>     part forces on the station in order to drive it upwards***, right?
>
> A.  ***Yes***.
>
> Q.  And then we have the negative G descent.  By negative G we know
>     that ***we have to have the motor applying forces driving the
>     station down faster than gravity alone would cause it to de-
>     scend***.  Do you agree with that as well?
>
> A.  ***Yes***.

Kutchek Dep. 59:24-61:18 (objections omitted).

The Detailed Description section of the specification also describes the
motor system as producing forces for driving the trolley up and down:

> The motor system 34 is comprised of a ***motor 54 for producing the
> necessary forces to move the rider and projector trolleys 24, 30 up
> and down*** along the tower 32 as desired and a ***force transfer struc-
> ture 56 for applying the forces*** produced by the motor to the rider and
> projector trolleys 24, 30.

'028 patent 7:1-5; *see also id.* 7:8-13 ("the motor 54 is a hydraulic motor and the
force transfer structure 56 includes a cable and w[i]nch structure that is capa-
ble of ***applying the forces to the rider trolley 24*** so that a rider in the car
40 can experience ***a high G ascent and a negative G descent***."), 7:15-21;

12

11:11-14 ("a motor platform 180 that supports the motors used to drive the rider trolley 104 ***vertically up and down***"), Abstract, 1:59-3:60, 4:64-5:61, 6:49-7:65, 8:32-9:7, 10:52-63, 11:15-37, 12:10-14:31, Figs. 11-16.

Despite all this, Raven Sun's construction does not require the motor system to produce any downward force, and moreover, does not require the motor system to drive any upward movement at all. *See* Pl.'s Br. 19 ("the invention does not require the motor system to use force to drive the trolley downward"), 20 (asserting that "there is no requirement found in the specification" that the motor system drive movement). Such a construction runs contrary to the unambiguous disclosure of the specification, as shown above.

In particular, Raven Sun contends without support that a cable winch embodiment discloses the use of gravity as the downward driving force to produce a "freefall." Pl.'s Br. 19. But the '028 patent never mentions "gravity" or "freefall," nor does it describe the use of gravity as a "motor system," and Raven Sun fails to cite any evidence to the contrary. Moreover, the section describing the cable winch structure expressly states that a motor "produces the necessary forces to move the rider and projector trolleys 24, 30 up and down" and the "cable and w[i]nch structure" is just used to transfer the force produced by the motor to the rider trolley. '028 patent 7:1-23. As such, the described motor system—and not gravity—produces forces for both upward and downward movement. Messner Decl. ¶ 91.

13

E.    "Controller"

| Raven Sun's Construction | WDPR's Construction |
|---|---|
| "One or more computer based devices that issue control signals to engage and control the projector, the motor system, and actuator system." | Means-plus-function claim governed by 35 U.S.C. § 112(f).<br><br>**Functions**:<br><br>causing: (a) the motor system to vertically position the rider station along the rider station tower so as to coordinate the vertical position of the rider station with imagery produced by the projector and displayed on the screen;<br><br>causing (b) the actuator system to position the rider station relative to the rider station trolley so as to coordinate the position of the rider station relative to the rider station trolley with imagery produced by the projector and displayed on the screen;<br><br>in coordinating the position of the rider station relative to the rider station tower and the rider station trolley with imagery being displayed on the screen causing: (c) the motor system to vertically move the rider station trolley and rider station along the rider station tower and the actuator system to simultaneously maintain a position of the rider station relative to the rider station trolley;<br><br>in coordinating the position of the rider station relative to the rider station tower and the rider station trolley with imagery being displayed on the screen causing: (d) the motor system to maintain the position of the rider station trolley and rider station along the rider station tower and the actuator sys- |

14

|  | tem to simultaneously move the rider station relative to the rider station trolley; and |
|  | in coordinating the position of the rider station relative to the rider station tower and the rider station trolley with imagery being displayed on the screen causing: (e) the motor system to vertically move the rider station trolley and rider station along the rider station tower and the actuator system to simultaneously move the rider station relative to the rider station trolley |
|  | **Corresponding Structure**: |
|  | The specification discloses the following structure for the "controller," but such structure is inadequate to perform the claimed functions and thus the term is indefinite: |
|  | The "controller 118" of Fig. 6 is described as "a computer device." *See* '028 patent at 12:66-13:1, Fig. 6. |

Section 112(f) of the Patent Act (previously Section 112, paragraph 6), provides that "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." "Controller" as recited in the claims of the '028 patent should be construed according to Section 112(f). And when it is, claim 1 should be declared invalid for indefiniteness because the specification fails to recite sufficient structure for the functions of the claimed "controller."

15

### 1.    Section 112(f) Applies to the Claimed "Controller"

To determine whether § 112(f) applies, the "essential inquiry is whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Grecia v. Samsung Elecs. Am. Inc.*, 780 F. App'x 912, 914 (Fed. Cir. 2019). Where a term lacks the words "means," there is a rebuttable presumption that § 112(f) does not apply, but that presumption is not a "strong" one as Raven Sun contends, *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015) (*en banc*), and is overcome when, as here, "the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*, 899 F.3d 1291, 1298 (Fed. Cir. 2018). "Generic terms such as 'mechanism,' 'element,' 'device,' and other nonce words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word 'means' because they 'typically do not connote sufficiently definite structure' and therefore may invoke § 112, para. 6." *Williamson*, 792 F.3d at 1350 (citing *MIT v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006)).

"Controller" here is just such a generic term or nonce word. Claim 1 is written in means-plus-function format, *i.e.*, as a generic means ("controller") "adapted to cause" a series of functions to occur. Opposite to establishing that "controller" is the name for specific structure, Raven Sun concedes the point,

16

acknowledging that the controller is actually any generic "computer device." Pl.'s Br. 25 ("The specification explicitly describes one 'controller' as being 'a computer device' that controls the operation of three systems."); *see also* Kutchek Decl. ¶ 28 (same).  Indeed, Mr. Kutchek squarely admitted that "***any*** computer device that performs the function of claim 1 of the '028 patent would be a controller."  Kutchek Dep. 47:19-48:4.

In some cases general functions such as "processing," "receiving," and "storing" "can be achieved by any general purpose computer without special programming," so no structure other than the general purpose computer need be claimed. *In re Katz Interactive Call Processing Pat. Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011).  This is not such a case.  Raven Sun's "controller" does not simply perform general purpose "computing" functions.  To the contrary, the claims require the controller to be able to perform numerous specialized and unique functions such as (a) causing the motor system to vertically position the rider station, (b) coordinating the vertical position of the rider station with imagery produced by the projector and displayed on the screen, (c) causing the actuator system to position the rider station relative to the rider station trolley, (d) coordinating the position of the rider station relative to the rider station trolley with imagery produced by the projector and displayed on the screen, (e) simultaneously maintaining a position of the rider station relative

17

to the rider station trolley, and (f) simultaneously moving the rider station relative to the rider station trolley, among other functions.  '028 patent cl. 1.

Here again, Mr. Kutchek's testimony confirms WDPR's construction: he admitted that the patent claims the controller as being "programmed in some way *to achieve or perform the functions that are listed,*" Kutchek Dep. 36:5-37:18, and that "no system you would buy as a controller" would "come ready to perform the function of claim 1"; rather "you would have to program it in order to perform all" of the functions of claim 1, *id.* 50:25-51:11; *see also id.* 39:14-40:21 (agreeing that "capable of causing" in the last limitation of claim 1 means "the controller has to be programmed and enabled to perform the functions that are listed in A, B, and C that follow."); *id.* 75:20-76:6 (admitting for "[a]ny controller, you would need to provide customized programming to receive the inputs, process the logic and control your outputs as desired," and that the algorithms would not come "when you buy the controller ready-made"); *id.* 27:9-16 (programming could take "weeks to months").

Thus even Raven Sun's expert agrees that the '028 patent "controller" performs "specific functions that would need to be implemented by programming a general purpose computer to convert it into a special purpose computer capable of performing those specified functions." *In re Katz*, 639 F.3d at 1316 (citing *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech*., 521 F.3d 1328, 1337 (Fed. Cir. 2008)); s*ee also Soque Holdings (Bermuda) Ltd. v. Keycsan, Inc*.,

18

No. C-09-2651, 2010 WL 2292316, at *12 (N.D. Cal. June 7, 2010) ("the naked term 'computer' cannot describe sufficient structure when recited directly in the claim limitation").  Moreover, the claimed functions are not those typical of a general purpose computer and require specific hardware.[2]  Messner Decl. ¶¶ 99-105; *Sysmex Corp. v. Beckman Coulter, Inc.*, No. CV 19-1642-RGA-CJB, 2021 WL 1259710, at *5 (D. Del. Apr. 6, 2021) (relying on claimed controller functions being "in line with those typically performed by a 'controller'" in finding Section 112(f) did not apply).

Raven Sun contends that courts routinely decline application of means-plus-function treatment to the term "controller."  Pl.'s Br. 23.  But its cited cases address different patents and are distinguishable because here both parties agree the controller is merely a generic computer device.  *SIPCO, LLC v. Emerson Elec. Co.*, 980 F.3d 865, 871 (Fed. Cir. 2020) ("We find it unsurprising that similarly worded claims may be construed differently when presented in such different contexts and different records.").[3]  Moreover the Federal Circuit has in fact determined that terms such as "control" and "control circuit" may be means-plus-function terms when used, as the "controller" here, as a generic

---

[2] Unlike in *Sysmex*, here Raven Sun's expert characterizes at least the coordinating activities performed by the claimed controller as new and different.  Kutchek Dep. 21:10-18.

[3] Raven Sun's argument that the description of "controllers" in other WDPR patents, such as U.S. Patent No. 9,174,704, somehow excludes means-plus-function treatment of "controller" in the '028 patent fails for the same reasons.

term for any structure performing the claimed function. *See, e.g., Fiber, LLC v. Ciena Corp.*, 792 Fed. App'x 789, 791 (Fed. Cir. 2019) ("a control operative for" positioning light beams was means-plus-function); *Intelligent Automation Design, LLC v. Zimmer Biomet CMF & Thoracic, LLC*, 799 Fed. App'x 847, 851 (Fed. Cir. 2020) ("control circuit for determining a time" was means-plus-function).

Raven Sun also cites to Mr. Kutchek to argue "controller" has a sufficiently definite meaning as the name for structure. Pl.'s Br. 24; Kutchek Decl. ¶¶ 22, 29. But Mr. Kutchek's declaration never shows any specific structure that is known as a "controller" for performing the specific functions claimed in the '028 patent. *Egenera, Inc. v. Cisco Sys.*, 972 F.3d 1367, 1374 (Fed. Cir. 2020) ("The question is not whether a claim term recites any structure but whether it recites sufficient structure—a claim term is subject to § 112(f) if it recites function without reciting sufficient structure *for performing that function*.) (emphasis in original). And, in deposition, Mr. Kutchek conceded that the "class" of structures he considers to be controllers is not really the name for a specific structure, but includes a broad diversity of computer devices including "programmable logic controllers," "programmable automation controllers," "distributed control systems," "embedded systems," and "industrial PCs," and that "there may be others." Kutchek Dep. 32:15-34:10; *see also id.* 48:6-

49:5 (admitting that one could not go to a supplier and merely ask for a "controller," but instead would need to specify the manufacturer, the application, and the number of inputs "to choose the correct controller."); *id.* 49:22-50:10. Ultimately, Mr. Kutchek admitted that the "controller" of the claims merely recites a "computer-based device." *Id.* 34:11-24.

### 2.    The Recited Functions of the "Controller"

Once it is determined that § 112(f) applies, the "court must first identify the claimed function" of the controller. *Williamson*, 792 F.3d at 1351. To do so, the Court should simply identify the functions for the controller set forth in the claim language itself. *Creo Prod., Inc. v. Presstek, Inc.,* 305 F.3d 1337, 1344 (Fed. Cir. 2002) ("The function of a means-plus-function limitation, however, must come from the claim language itself."); *JVW Enters., Inc. v. Interact Accessories, Inc.,* 424 F.3d 1324, 1331 (Fed. Cir. 2005).

Again, claim 1 lists a host of functions performed by the "controller":

- causing: (a) the motor system to vertically position the rider station along the rider station tower so as to coordinate the vertical position of the rider station with imagery produced by the projector and displayed on the screen;

- causing (b) the actuator system to position the rider station relative to the rider station trolley so as to coordinate the position of the rider station relative to the rider station trolley with imagery produced by the projector and displayed on the screen;

- in coordinating the position of the rider station relative to the rider station tower and the rider station trolley with imagery being displayed on the screen causing: (c) the motor system to vertically move the rider station trolley and rider station along the rider station tower

21

and the actuator system to simultaneously maintain a position of the rider station relative to the rider station trolley;

- in coordinating the position of the rider station relative to the rider station tower and the rider station trolley with imagery being displayed on the screen causing: (d) the motor system to maintain the position of the rider station trolley and rider station along the rider station tower and the actuator system to simultaneously move the rider station relative to the rider station trolley; and

- in coordinating the position of the rider station relative to the rider station tower and the rider station trolley with imagery being displayed on the screen causing: (e) the motor system to vertically move the rider station trolley and rider station along the rider station tower and the actuator system to simultaneously move the rider station relative to the rider station trolley.

'028 patent cl. 1. Notably, Raven Sun offers no competing functions—*see* Kutchek Dep. 45:5-23—so, if the Court agrees the "controller" is a means-plus-function term, then there is no dispute that these are its proper functions. *See* Pl.'s Br. 22-24.

### 3. The Corresponding Structure for the "Controller"

After identifying the functions, the Court then "must determine what structure, if any, disclosed in the specification corresponds to the claimed function." *Williamson*, 792 F.3d at 1351. Here, again, the only disclosed structure for the controller functions of the '028 patent is a generic "computer device."

"Corresponding structure must include all structure that actually performs the recited function." *Applied Med. Res. Corp. v. U.S. Surg. Corp.*, 312 Fed. Appx. 326, 333 (Fed. Cir. 2009).

Here, the specification describes the controller as follows:

22

> Generally the controller 118 is a computer device that controls the oper-
> ation of the projectors [sic] systems 108A-108D, the motor system 114,
> and the actuator systems 106A-106D. More specifically, the controller
> 118 issues control signals that cause: (a) the projector systems 108A-
> 108D to project video imagery on the screens 116A-116D, (b) the motor
> system 114 to move the rider trolley 104 and the rider stations 102A-
> 102D in a manner that is coordinated with or synchronized to the move-
> ment of some object in the projected imagery, and (c) the actuator sys-
> tems 106A-106D to move each car 122 in a manner that is coordinated
> with or synchronized to the movement of Some object in the projected
> imagery.

'028 patent 12:66-13:10. Despite its length, this description boils down to a disclosure that the controller is any "computer device" that "issues control signals" to perform the claimed functions. And every other reference to the controller in the specification is purely functional, describing the controller by what it does without ever explaining what it is. *Id.* Abstract; 1:59-3:36; 5:26-61; 7:38-10:15; 12:66-14:31; Figs. 1, 6; Messner Decl. ¶¶ 99-102. Here again, Mr. Kutchek confirms this. Kutchek Dep. 52:13-74:25 (confirming passages Raven Sun cites disclose only a computer device that issues control signals).

The evidence cited by Raven Sun confirms the lack of any structure for the "controller" beyond the generic reference to it as a "computer device." For example, Raven Sun points to Figures 1 and 6. Pl.'s Br. 24. These figures are powerful evidence for WDPR: they show nothing more than boxes labeled "controller" disconnected from any other structure:

CONTROLLER

This literal black box tells the reader nothing about what the controller is. *See Sysmex*, 2021 WL 1259710, at *6 (if the claimed controller is a "black box," it "must get mean-plus-function treatment").

Raven Sun then walks through various instances of "commands" and "control signals" issued by the controller, but these too are merely generic statements that the controller, like every other computer, issues instructions to perform its functions. As even Mr. Kutchek admits, any computer serving as a controller "has to be programmed in a way to issue those control signals," and the controller "doesn't do it by itself." Kutchek Dep. 67:21-68:4. The specification does not disclose any hardware or software the "computer device" uses to send "commands" or "control signals." Messner Decl. ¶¶ 107-114. Thus, these nondescript references to generic signals and commands—which just restate functionality—add nothing to the "computer device" itself.

Raven Sun also points to an "operator interface" that purportedly allows for input into a system. Pl.'s Br. 25-26. But the patent's sole reference to this interface also describes it in purely functional terms: "The controller 38 also has an operator interface that allows an operator to initiate and terminate the operation of the ride 20." '028 Patent 7:63-65. And there is no disclosure of any hardware or software for the "computer device" to receive inputs from sensors to perform its "coordination" functions. Messner Decl. ¶ 112. The specification provides no description of how any such control signals or inputs would

be received, processed, or sent by the controller, as a generic computer device, without more, does not have the hardware or software to receive sensor inputs or send the highly specific control signals required by the claims.

In short, the only corresponding structure for the claimed functions of the controller of the '028 patent is the "computer device" of column 12. The Court should construe "controller" to have this structure and nothing more.

### 4.    The "Controller" Terms Are Indefinite

If the Court agrees that the only corresponding structure for the "controller" is a computer device, then claim 1 should necessarily be held indefinite and so invalid.

"Section 112 of the Patent Act of 1952, applicable to this case, requires the patent applicant to conclude the specification with 'one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.' 35 U.S.C. § 112, ¶ 2 (2006 ed.). A lack of definiteness renders invalid 'the patent or any claim in suit.' § 282, ¶ 2(3)." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2125 (2014).

For means-plus-function terms in particular, if "the patentee fails to disclose adequate corresponding structure, the claim is indefinite." *Williamson*, 792 F.3d at 1352; *see also id.* ("Under 35 U.S.C. § 112, paras. 2 and 6, therefore, if a person of ordinary skill in the art would be unable to recognize the structure in the specification and associate it with the corresponding function in the

claim, a means-plus-function clause is indefinite."); *Aristocrat*, 521 F.3d at 1331 ("[I]n the absence of structure disclosed in the specification to perform those functions, the claim limitation would lack specificity, rendering the claim as a whole invalid for indefiniteness under 35 U.S.C. § 112 ¶ 2.").

And in "cases such as this, involving a claim limitation that is subject to § 112, para. 6 that must be implemented in a special purpose computer, this court has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor. … We require that the specification disclose an ***algorithm*** for performing the claimed function." *Williamson* 792 Fd.3d at 1352. "The algorithm may be expressed as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Id.* When no such algorithm is disclosed in the specification, the claims are invalid. *Id.* at 1354; *see also Aristocrat*, 521 F.3d. at 1337-8 ("Here, as in *Medical Instrumentation*, the patent does not disclose the required algorithm or algorithms, and a person of ordinary skill in the art would not recognize the patent as disclosing any algorithm at all. Accordingly, the means-plus-function limitations of claim 1 lacked sufficient disclosure of structure under 35 U.S.C. § 112 ¶ 6 and were therefore indefinite under 35 U.S.C. § 112 ¶ 2.").

There can be no legitimate dispute that the requisite algorithm is never set forth in the '028 patent. The claims recite only functions to be performed

by the controller with no mention of any algorithm used to perform them.[4] *See supra* Section IV.E.2. And, the specification is devoid of any algorithm explaining how to program the "computer device" to perform any—let alone ***all***—of the claimed functions, as is required. *See supra* Section IV.E.3. Raven Sun identifies no algorithm from the specification and its expert, Mr. Kutchek, again supports WDPR's position:

> Q.    … There's nowhere you've seen in the '028 patent, Exhibit 1, where the patent sets forth a – an algorithm that you would use to program the controller or that the controller would use to perform the functions of claim 1 of the '028 patent; is that correct?
>
> A.    It doesn't specifically address the algorithms, but the nature of a controller is you can't have a controller without algorithms.

Kutchek Dep. 75:1-14; *see also id.* 52:13-74:25 (confirming no passage cited in his report sets forth an algorithm for performing the function of the claims); Kutchek Decl. ¶ 28; Messner Decl. ¶¶ 110-115.

In sum, Raven Sun was compelled to "disclose an ***algorithm*** for performing the claimed function." *Williamson* 792 F.3d at 1352. There is none, and claim 1 is thus indefinite.

---

[4] Nor does the specification disclose hardware that could be used to receive or send the necessary signals to perform the various controller functions.

### F.    "Coordinate" and "Coordinating"

| Raven Sun's Construction | WDPR's Construction |
|---|---|
| "Coordinating with the imagery on screen relative to the rider station and thus the rider so that the rider experiences forces as if participating in the scene being displayed on the screen." | Plain and ordinary meaning. |

"Coordinate" and "coordinating" in the '028 patent are plain English terms used in their standard sense, and would have been understood by a person of ordinary skill in the field when the '028 patent was filed.  Messner Decl. ¶¶ 116-124.  No additional construction of these simple words is warranted, and Raven Sun's winding and confusing construction should be rejected.

The claim language imposes no special meaning to "coordinate" or "coordinating," requiring only that the controller "coordinate the vertical position of the rider station with imagery produced by the projector," and that it take other steps when "coordinating the position of the rider station relative to the rider station tower and the rider station trolley with imagery being displayed." '028 patent cl. 1.  Nowhere does the claim language say anything about what "the rider experiences" or that the claimed coordination must create an experience for the rider "as if participating in the scene being displayed on the screen," as injected by Raven Sun.  Indeed, it is striking that Raven Sun's construction first repeats the term "coordinating"—demonstrating that the word has an understood meaning—but then packs on thirty-one additional words to

28

rewrite the term into something unrecognizable in the claims.

The specification too demonstrates that "coordinate" and "coordinating" were used according to their plain meaning throughout to refer generally to the various systems working together. *See* '028 patent 2:9-19 ("the control system … is also adapted to cause the actuator system to position the rider station relative to the rider station trolley so as to *coordinate* the position of the rider station relative to the trolley with imagery being projected onto the screen."); *see also id.* 2:55-60; 3:24-29; 12:66-13:10; 13:46-56. Not once does the specification ever refer to "coordinating" as somehow creating "rider experiences as if participating in the scene being displayed on the screen."

Even the specification passage that Raven Sun apparently relies on does not describe "coordinating," but instead describes "synchronizing":

> Another type of amusement park ride endeavors to make the rider feel as if the rider is participating in the imagery that is being displayed on a screen by employing actuators to move the rider's chair and the rider relative to a platform in a manner that is ***synchronized*** with the imagery being displayed on a screen visible to the rider. By moving the rider in this manner, the rider believes that they are experiencing the forces that the rider would experience if actually participating in the scene being displayed.

'028 patent 1:12-49. Nothing about this passage is remotely definitional of "coordinate" or "coordinating."

Raven Sun also errs in requiring that the rider experience forces "as if" participating in the scene. As the specification of the '028 patent explains, this is simply not possible: The movements and forces in the imagery projected on

29

the screen are "***significantly greater*** than the movements and forces that the actuators are actually capable of generating." '028 patent 1:12-49.

Last, Raven Sun's construction further invites legal error by defining the claims based on what the rider "experiences" and whether that rider subjectively feels "as if [they are] participating in the scene being displayed on the screen." Limitations such as Raven Sun proposes here that rely on a person's subjective perception as opposed to an objective measure, are indefinite. *See, e.g., Interval Licensing LLC. v. AOL, Inc.*, 766 F.3d. 1364, 1371 (Fed. Cir. 2014) (invalidating as subjective a display that "distracts a user from his primary interaction"); *Datamize, LLC. v. Plumtree Software Inc.*, 417 F.3d 1342, 1346 (Fed. Cir. 2005) ("aesthetically pleasing" indefinite). Raven Sun's proposed construction would create the untenable situation in which infringement fluctuates based on whether a given rider is more or less susceptible to the visual, audio, and haptic cues of the ride and how those cues make the rider feel. This is exactly the type of subjective claim the law proscribes. *Id.*

In sum, "coordinate" and "coordinating" simply mean what they say, and Raven Sun's attempt to add 31 additional words to them should be rejected.

## IV.  CONCLUSION

For the reasons set forth above, WDPR respectfully asks the Court to adopt its proposed constructions for each disputed term of the '028 patent.

30

Dated: October 26, 2022          */s/ Douglas E. Lumish*

Douglas E. Lumish (admitted *pro hac vice*)
Linfong Tzeng (admitted *pro hac vice*)
**Latham & Watkins LLP**
140 Scott Drive
Menlo Park, CA 94025
Telephone: (650) 328-4600
doug.lumish@lw.com
linfong.tzeng@lw.com

Joseph H. Lee (admitted *pro hac vice*)
**Latham & Watkins LLP**
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626-1925
Telephone: (714) 540-1235
joseph.lee@lw.com

Bradley P. Blystone
Florida Bar #894109
**Marshall, Dennehey, Warner, Coleman & Goggin**
315 E. Robinson Street, Suite 550
Orlando, FL 32801
Telephone: (407) 420-4380
bpblystone@mdwcg.com

*Counsel for Defendant Walt Disney Parks and Resorts U.S., Inc.*

CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2022, the foregoing document was filed using the Court's CM/ECF system and notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

*/s/ Douglas E. Lumish*